FIALI'I FA'AVAE and FA'ATUPU FA'AVAE, Plaintiffs

v.

AMERICAN SAMOA POWER AUTHORITY
and AMERICAN SAMOA GOVERNMENT, Defendants

High Court of American Samoa
Trial Division

CA No. 76-86

July 23, 1987

Before REES, Chief Justice, VAIVAO, Associate Judge, and TUIAFONO, Associate Judge.

Counsel: For Plaintiffs, Aviata Fa'alevao
         For Defendants, Martin Yerick,
             Assistant Attorney General

Announcement from the Bench by REES, C.J.:

We are here to announce our judgment at this time, which is, there will be judgment for the Plaintiffs in the amount of $22,000.00. Now we'll also announce our reasons from the bench and if either side wants to provide anything in writing on some of the figures, they may be subject to correction. We're simply going to give you our best calculations at this time. Dealing with the issues one by one:

First of all, the Government asserts that ASPA is simply not liable for this sort of thing. There is a provision in the Administrative Code which if it were within the power of the ASPA Board of Directors would absolve ASPA from virtually all of the liability they could ever have had. We think that's inconsistent first with the explicit statutory provision that says that ASPA can sue and be sued, and second with the general rule that provisions that tend to absolve the person who makes them from liability for his own negligence are to be strictly construed.

If ASPA were a private company, even if they'd gotten the Plaintiffs or the Plaintiffs' decedent to sign something that says no matter what we do in the course of providing you electricity, no matter how negligent we are, we are exempt from any liability, except under the most extraordinary circumstances that provision would be invalid as contrary to public policy. So, far from the net weight of public policy being in favor of exoneration from liability for negligence, most of the jurisprudence on public policy is exactly to the contrary. I've got to believe that if public

-54-

utilities could have absolved themselves so broadly and so easily we wouldn't have any Michigan case in 1983 talking about the standards of liability for public utilities. So we don't believe that that provision operates to exonerate ASPA at least where, as here, negligence is clear.

We don't have to reach the question whether there is a stricter standard for liability for a public utility than the reasonable person standard, because in this case the reasonable person standard was violated. The reasonable person in the business of providing electric power to people would check his wires more than once every 35 years to see that they were not in need of replacement.

The tree trimming issue is a little more difficult, in light of the testimony in this case about how difficult it is to get on people's lands and trim trees. We think there was a duty at least to ask permission. If permission had been denied by the communal land owner, obviously we would have a much different situation. But in light of the industry standard (as proved by the manual that everyone seems to agree was a fair statement of industry standards) tree trimming apparently is a normal incident of maintaining power lines. While there might be special problems in American Samoa, none of the judges think that that justifies the provider in throwing up his hands and simply saying, "Well, nothing can be done." There was a duty to make some effort.

Again, it's not necessary even to reach the tree trimming issue because whether or not they should have trimmed the tree, they should have replaced the wire and the bare wire by itself would have been enough to cause the accident. So at least there was clear negligence in not replacing that wire.

The deceased, however, was obviously contributorily negligent. We believe that it was clearly negligent for ASPA not to check the wires knowing that insulation can become frayed and that when these things are close to people's houses they can cause electrocution. While we also think that ASPA was under some duty to recognize that people do climb trees, certainly the decedent was in a position to know (at least once he had the idea that there might be some electrical current running through the tree) not to be up there. He was of sufficient age and discretion to realize that by going up that tree with a metal pole he was taking

-55-

a great risk. Our view is that each of the parties' negligence was so clear that although it's hard to come up with any precise standard, we will attribute half of the negligence that caused this accident to ASPA and half to decedent.

Now, as far as the calculation of damages is concerned, the hardest thing is to calculate future income and how much of that future income would have been given to the parents. Obviously it's very speculative that he would have been a plumber or that he would have been something else. He was obviously a bright boy who was likely to do something with his life, yet at some point how much of that money would have been given to his parents is hard to say. However, I've discussed it with the Samoan judges who have more experience than I do in evaluating what is customary here and it's pretty clear that the net financial benefit that his parents derived from him was about $1,000.00 per year. We don't know whether he would become a brain surgeon. We wouldn't know if he would have died soon in another way. The likeliest thing is to assume that that rate would have continued, that $1,000.00 or whatever the real dollar equivalent of $1,000.00 was for the rest of his life and his parents' lives would have continued to be the financial benefit they derived from him. Now a lot of things could have happened. He could have gotten married and moved away from home and begotten several children, in which case the amount might have gone down or the amount might have gone up. The Samoan judges are comfortable as I am with saying that $1,000.00 a year is about right for the amount that the parents can expect a child to give to them here in this territory. So we're going to say that it's $1,000.00.

Then there is a question of how long. Obviously it's not the decedent's life expectancy that matters because the parents are older than he was. There was no specific evidence of his parents' ages, but both the appearance of his father and the usual custom in such things leads us to say they are between 20 and 30 years older than he is. The life expectancy of a woman is slightly more than the life of a man which would be 71 years, and the parents can expect to have received that money from him for the rest of their lifetimes, which is to say 20-30 years. So we will say 25 years and we will say that $25,000.00 is the financial loss that the parents suffered; however, it's more complicated than that because you've got

to figure out the future discounted value of $25,000.00.

I have checked A.L.R. Proof of Facts, which I thought would be good for something, which doesn't even turn out to be good for this; because all it tells is a whole lot of different rules about discounts depending on interest and inflation rates and depending on things like that. The figure that seems intuitively correct to me --- keeping in mind the facts that $1,000.00 isn't going to be worth $1,000.00 25 years from now and that it's not as simple as how long it takes the money to reach a certain amount at a specified interest rate--- assuming an interest rate of six percent, which is what there is now, and assuming inflation of about what there is now, our best estimate is that the present discounted value of $25,000.00 or its real dollar equivalent in the future years is about $16,000.00. So we will award $16,000.00.

Obviously, if either party has statistics suggesting this calculation is wrong he can move for reconsideration or new trial and we'll be more than ready to entertain that sort of evidence. Since there wasn't any evidence, we're going to make the estimate that it's $16,000.00.

None of the other items are very easy either. Probably the most important thing in terms of the parents' real loss isn't the financial loss that they would suffer. It's the loss of their son's moral and emotional support and companionship. That is an element of our award and the estimated amount is $20,000.00. It's not as high as in the Tedrow case or a lot of cases in the States, but it's higher than some cases in American Samoa and it's our best estimate.

The next item is the funeral. We've had a complicated discussion about the extent to which fa'asamoa obligations should be considered in connection with these kinds of awards, but in light of the obligation that a wronged party has to minimize damages, we simply don't feel comfortable with charging ASPA for sixty kegs of beef. It's well-known that in Samoan culture whatever you give is supposed to come back to you sooner or later somehow. Depending on where you are in the scale of society, you either do a little worse or a little better by the end of the year in all the fa'alavelaves, you going to other people's and others coming to you. So it's hard to calculate what the net cost of a fa'alavelave is. We think

-57-

that with the value of the casket and the necessity of preparing a body and even (aside from the giving to other people) the aspect of providing some accommodation for people at the funeral, $3,000.00 is a fair award for the funeral. Therefore we will award $3,000.00 as funeral expenses.

Now finally there is the claim for decedent's pain and suffering. Contrary to the position taken by the Government in this case, the Court believes that A.S.C.A. §§ 43.5001 and 5002 merely state the rule that prevails in most jurisdictions: that there are two separate kinds of actions. One of them is the wrongful death action, which consist of the damages that are suffered by other people when somebody dies. The other is the survival action, which consists of whatever he would have been able to recover. The representatives of the estate can sue for him. I've read § 43.5002 during the break. We think the decedent could have sued, if he had lived, for the pain and suffering that he suffered; therefore his successors in interest can sue, whoever they are. There is an allegation in the complaint that the parents are the representatives of his estate; that allegation is to be construed liberally, so we will award this item of damages to the parents in their capacity as representatives of the estate. This means that all probate rules have got to be complied with. We will award damages for pain and suffering. Again, it's terribly difficult, but in light of the damages that are usually awarded, this was a painful death but it was a painful death in which the period of consciousness lasted for 30 seconds. It wasn't as painful as in some kinds of death for which higher awards have been made. So we will award $5,000.00 as pain and suffering in the survival action.

Since we've awarded the funeral expenses not to his estate, but to the parents who paid them, the only element in the survival action is $5,000.00 for his pain and suffering.

Therefore the total is as follows: $16,000 for future income that the parents have lost; $20,000 for the loss of support, companionship, and all of those non-pecuniary elements of the wrongful death action; $3,000 for funeral expenses; and $5,000 for pain and suffering. That comes up to $44,000 divided by two which is $22,000.

Now actually $2500 of that $22,000 is going to the estate, to the parents in their capacity as representatives. The other $19,500.00 is to the parents in their own capacity.